# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMBER CORRITORE,<br>as Administrator of the Estate of<br>APRIL DAWN CORRITORE,<br><br>        Plaintiff,<br>  v.<br><br>WEXFORD HEALTH SOURCES, INC.,<br>MEDICAL ASSOCIATES OF ERIE,<br>GARY PETERSON, DO, and<br>CHRISTINA MEALY, PA-C,<br><br>        Defendants. | Case No. 1:19-cv-18-SPB |

## **MEMORANDUM OPINION**

Plaintiff Amber Corritore ("Plaintiff") filed this civil action in her capacity as administrator of the estate of her late sister, April Dawn Corritore, who was an inmate at the Erie County Prison at the time of her death. The named Defendants are Wexford Health Sources, Inc. ("Wexford), Medical Associates of Erie, Gary Peterson, DO ("Dr. Peterson"), and Christine Mealy, PA-C ("Mealy"). In her three-count complaint, Plaintiff asserts a federal claim under 42 U.S.C. §1983, based upon the alleged violation of April's Eighth Amendment rights, as well as survival and wrongful death claims under Pennsylvania law.[1]

Presently pending before the Court are a motion to dismiss filed by Wexford and Mealy, ECF No. 17, and a separate motion to dismiss filed by Dr. Peterson, ECF No. 20. For the reasons that follow, the motion filed by Wexford and Mealy will be denied as to the claims against Wexford and granted in part with respect to the claims against Mealy. Dr. Peterson's motion to dismiss will be denied.

---

[1] The Court's subject matter jurisdiction is predicated upon 28 U.S.C. §§1331 and 1367.

1

## I. BACKGROUND[2]

On September 19, 2018, April Corritore (hereafter, "Decedent") was processed into the Erie County Prison ("ECP"). Amended Compl. ¶36. Two days prior, she had been diagnosed with pneumonia and cellulitis, for which physicians at UPMC Hamot had prescribed two types of antibiotics. Id. ¶35.

As part of her processing at ECP, Decedent underwent a medical screening. LPN Teri Masi noted Decedent's diagnosis on her medical intake form and recorded the following information:

- Decedent was on medications for her pneumonia;

- Decedent was experiencing disorientation, fever, nausea, active cough, shortness of breath, and asthma/respiratory distress;

- Decedent had previously been hospitalized relative to pulmonary disease;

- Decedent was currently using a Ventolin Inhaler daily. Id. ¶37.

Despite the fact that Decedent presented with pneumonia, no one from ECP ordered the antibiotics that she had been prescribed. Id. ¶38.

At approximately 9:00 p.m. on the night of October 6, 2018, Decedent reported to LPN Emily Treveline that she was coughing up blood. Amended Compl. ¶39. Decedent showed Treveline a piece of toilet paper with a "large amount of bright red blood" and stated that this had been happening "off and on" since her arrival at ECP. Id. Treveline noted Decedent's complaints of chest pain and recorded the following vital signs: "96/64 (decreased), heart rate 114 (increased), respiratory rate 18 (increased), temperature 103.1, oxygen saturation level 96%." Id. Defendant Mealy "[was] notified with orders to send to ER." Id.

---

[2] The following background facts are derived from the well-pled factual averments in Plaintiff's Amended Complaint, ECF No. 5, the operative pleading. For present purposes, the Court accepts these well-pled averments and true and draws all reasonable inference in Plaintiff's favor.

2

At 1:13 a.m. on October 7, 2018, Decedent was sent to the emergency room at UPMC Hamot. Amended Compl. ¶¶40-42. Treveline noted that "Inmate has temp of 103.1, complains of strong-smelling urine, dizzy, lightheaded, coughing up blood. Christina Mealy, PAC notified. Sent to ER." Id. ¶41.

Later that day, Decedent was released from UPMC Hamot. Treveline noted that "all labs and tests came back negative. Inmate was ordered acetaminophen and ibuprofen for fever and muscle aches and Tessalon capsules for her cough. Inmate is calm and compliant." Amended Compl. ¶43. Upon Decedent's return from UPMC, Mealy ordered vital signs with temperature checks to be taken each shift for the following forty-eight hours. Id. ¶44. Despite this directive, no vital signs, other than Decedent's temperature, were taken. Id. ¶45. Mealy noted the following day: "Inmate sent to hospital with bronchitis. Still running a fever. Will increase Tylenol frequency. Inmate to let us know if she is not feeling better within a week or two." Id. ¶46.

Decedent underwent a chest X-ray on October 9, 2018, which indicated pneumonia in her right lower lung, and "what may be a developing abscess or other etiology." Amended Compl. ¶47. The reviewing radiologist recommended "[r]adiographic follow up throughout therapy." Id. After reviewing the chest x-ray report, Mealy ordered Azithromycin (an antibiotic) and a follow-up x-ray in two weeks. Id. ¶48. Mealy did not order any additional follow-up or re-evaluation. Id.

On October 11, 2018, Decedent's condition continued to deteriorate. Amended Compl. ¶50. Heidi Karash, the prison's Director of Nursing, noted:

> Inmate with dry peeling hands and palms, complains of not feeling good, body aches, headache, difficulty breathing. Inmate was panting during assessment and skin was notably hot during examination. Upon further evaluation inmate had a temperature of 103.2 and an oxygen saturation level of 94% with [rhonchi] and

3

> wheezes to upper and lower right lobes and some wheezing in left lower lobe, left upper lobe was clear. Inmate brought over to medical for breathing treatment. After treatment oxygen saturation level was still 94% but lung sounds were clear. Inmate was given Tylenol STAT for elevated temperature, recheck was down to 101.9. Moving to bottom bunk/bottom tier until cleared by medical.

Id. Decedent's treatment plan involved the continued administration of Tylenol, temperature checks every shift, and assigning Decedent to the bottom bunk and bottom tier until she received a medical clearance. Id. ¶51. By early afternoon, Decedent was still running a temperature of 102 and reported hotness, leg cramps, dizziness, and "over all not feeling well." Id. ¶52. Dr. Peterson, ECP's Medical Director, ordered another oral course of antibiotics, but did not examine Decedent or order any further diagnostic testing. Id. ¶55. The new course of antibiotics was started the following day, October 12, 2018. Id.

On October 13, 2018, Decedent reported feeling dizzy and nauseous and had a temperature of 102.1. Amended Compl. ¶56. After being contacted at home, Mealy ordered 1000 mg of Acetaminophen STAT to reduce Decedent's fever, to be followed by a temperature re-check; Mealy took no additional steps to investigate the cause of the fever. Id.

During the time frame from October 8, 2018 to October 15, 2018, Plaintiff continued to record elevated temperatures and pulse rates. Amended Compl. ¶59. By October 17, 2018, Plaintiff was barely able to move and declined to see a dentist, despite having "2 really bad teeth" that were causing her significant pain. Id. ¶61 and n.2. Treveline noted "Inmate has elevated heart rate and decreased blood pressure with elevated temps randomly. Telephone orders from Dr. Gary Peterson for vital signs and temperature checks every shift until cleared by medical." Id. ¶62. Dr. Peterson did not examine or speak with Decedent, nor did he order any further diagnostic testing. Id. ¶¶63-66.

4

On October 18, 2018, Decedent was seen by RN Christa Knotts, who administered an albuterol breathing treatment and coached Decedent to practice deep breathing at least ten times per hour. Amended Compl. ¶68. Later that day, Autumn Brown, LPN observed that Decedent was "panting during 2100 med pass." Id. ¶69. Despite attempting deep breathing, Decedent "would return to panting," and her oxygen saturation level at that time was just 87 percent. Id.

By the early morning hours of October 19, 2018, Decedent was still exhibiting a fever along with wheezing in her left lung. Amended Compl. ¶73. She refused the breathing treatment and informed the attending nurse that it was "not helping [her] breath." Id. At midmorning that day, Dr. Peterson reviewed Decedent's chart, noted her diminished oxygen saturation level, and ordered another x-ray. Id. ¶74. He recorded in his notes that Decedent had been educated by the nursing staff "on multiple occasions" to perform deep breathing, but put forth "[q]uestionable effort." Id.

The x-ray was taken within the ensuing hours and showed "Prominent bilateral pneumonias much greater on the left than on the right with mild right effusion." Amended Compl. ¶78. Despite this report, which Plaintiff claims should have resulted in the Decedent's immediate hospitalization, Decedent was left along in her cell for the remainder of the day. Id. ¶79. LPN Autumn reported that "[d]uring 1600 med pass inmate panting in med line refused to practice deep breathing states that she is to [sic] tired and does not want to ambulate . . . states 'I'm going back to lay down.'" Id. ¶80.

The following morning, October 20, 2018, one of nurses on ECP's medical staff contacted Dr. Peterson at home. Amended Compl. ¶81. On Dr. Peterson's orders, Decedent was transported to the Millcreek Community Hospital, arriving just before 11:00 a.m. Id. ¶¶ 81, 85.

5

At the hospital, Decedent was diagnosed with severe sepsis due to bacterial pneumonia and a urinary tract infection, abnormal liver function, acute kidney failure, hyperkalemia, acidosis, and possible endocarditis. Studies showed widespread septic emboli throughout her chest and abdomen. Id. ¶87. Despite the administration of two different intravenous antibiotics, as well as supportive care to manage her septic shock, Decedent continued to deteriorate until 7:44 p.m., when she became unresponsive. Id. ¶89. Thereafter, hospital personnel attempted cardiopulmonary resuscitation for nearly ninety minutes, to no avail. Id. ¶90. At 9:08 p.m., Decedent was declared dead. Id. Hospital personnel listed the cause of death as cardiac arrest due to bacterial endocarditis and septic shock. Id. Decedent was just thirty-three years old. Id. ¶94.

This lawsuit followed with the filing of Plaintiff's complaint on January 22, 2019. ECF No. 1. Her Amended Complaint, the operative pleading, sets forth three counts: a claim under 42 U.S.C. §1983 based upon alleged violations of Decedent's Eighth Amendment rights (Count I), and wrongful death/survival actions under Pennsylvania law based upon the alleged professional negligence of Defendants Peterson and Mealy (Counts II and III, respectively). *See* ECF No. 5.

On April 5, 2019, Defendants Wexford and Mealy filed their pending motion to dismiss the Amended Complaint. ECF No. 17. Dr. Peterson's pending motion to dismiss followed on April 9, 2019. ECF No. 19. Plaintiff filed her brief in opposition to the Defendants' motions on April 27, 2019. ECF No. 22. At this point, the relevant issues have been adequately joined and the Defendants' motions are ripe for resolution.

## II. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure recognizes a defense based upon the plaintiff's failure to state a claim upon which relief can be granted. "When considering a Rule 12(b)(6) motion, we accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 526–27 (3d Cir. 2018) (internal quotation marks and citations omitted). In order to survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## III. DISCUSSION

### A. Plaintiff's Claims Under 42 U.S.C. §1983

Plaintiff's first cause of action is brought under 42 U.S.C. §1983, which provides a private right of action against

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. §1983.

7

To state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must also show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). As there is no dispute about the Defendants' status as state actors for purposes of §1983 liability, the relevant question is whether Plaintiff has pled a plausible violation of the Decedent's federally guaranteed rights – specifically, her Eighth Amendment right to be free from cruel and unusual punishment. *See* U.S. Const. amend VIII.

To state an Eighth Amendment violation in the medical context, a plaintiff must plausibly allege "'(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need.'" *Anderson v. Bickell*, 754 F. App'x 113, 116 (3d Cir. Nov. 2, 2018) (quoting *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016)); *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (The ban on cruel and unusual punishment set forth in the Eighth Amendment to the United States Constitution extends to prohibit a prison official's "deliberate indifference to serious medical needs of prisoners."). Here, Defendants do not dispute that the Decedent had serious medical needs while she was incarcerated at the Erie County Prison; they argue only that Plaintiff has not pled deliberate indifference.

Allegations of deliberate indifference involve "a high threshold." *Anderson,* 754 F. App'x at 116. Prison officials are "deliberately indifferent" only if they know that an inmate faces a substantial risk of serious harm and nevertheless disregard that risk. *Id.* (quoting *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016)). Allegations of mere negligence or disagreement with medical decisions are insufficient to establish deliberate indifference because "'prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners.'" *Id.* (citing *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) and quoting *Palakovic v. Wetzel*, 854

8

F.3d 209, 227 (3d Cir. 2017)). Thus, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference[.]" *Id.* (quoting *Palakovic*, 854 F.3d at 227) (alteration in the original).

On the other hand, deliberate indifference is established "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Additionally, prison health care providers act with deliberate indifference if they "insist[ ] on continuing courses of treatment" that they know are "painful, ineffective or entail[ ] substantial risk of serious harm to the prisoners." *White v. Napolean,* 897 F.2d 103, 109 (3d Cir.1990).

Here, the gravamen of Plaintiff's §1983 claims is that Defendants Mealy and Peterson acted with deliberate indifference toward the Decedent's serious medical needs by declining to meaningfully reevaluate her treatment plan after her initial course of antibiotics failed to yield any improvement. More specifically, Plaintiff asserts that Mealy and Dr. Peterson should have ordered additional diagnostic testing and imaging and/or a different antibiotic and/or prompt hospitalization, once it became clear that Plaintiff was not responding to her initial course of treatment and that her condition was deteriorating.

As set forth in the Amended Complaint, Mealy's first involvement with the Decedent occurred on or around October 6, 201, when Mealy directed the Decedent to be sent to the emergency room at UPMC Hamot, based upon reports that she was complaining of chest pain, had been coughing up blood, and showed abnormal vital signs. After her laboratory reports and tests came back negative, Decedent was discharged back to ECP on October 7, 2018 with

9

instructions to take Tylenol and Advil for fever and body aches and Tessalon capsules to manage her cough. That same day, Mealy directed the nursing staff to check Decedent's temperature and vital signs at each shift. The next day, October 8, 2018, Mealy increased the frequency of Decedent's Tylenol dosage to address her continuing fever. On October 9, 2018, Decedent underwent an x-ray that showed pneumonia in her right lower lung and a possible abscess developing. Based on this study, Mealy prescribed Decedent an antibiotic and ordered a follow-up x-ray to be taken in two weeks. In this Court's estimation, nothing in the foregoing course of events plausibly demonstrates deliberate indifference on the part of Mealy to the Decedent's medical condition.

Mealy's only other involvement occurred on October 13, 2018, when the nursing staff called her at home to address the Decedent's complaints of dizziness, nausea, and fever. On that date, Mealy directed staff to administer 1000mg Tylenol immediately, to address Decedent's fever, then recheck her temperature afterward. According to Plaintiff, Mealy should have taken more proactive steps toward diagnosing Decedent's illness and/or updating her treatment plan and/or referring her to an outside hospital after her initial course of antibiotics proved ineffective. Amended Compl. ¶¶ 100-01, 123-24, 131-33. But Mealy's alleged inaction must be viewed in the context of the Amended Complaint as a whole. According to Plaintiff's own averments, Dr. Peterson had prescribed the Decedent a second oral antibiotic on October 11, 2018, after Decedent failed to respond to the antibiotic initially prescribed by Mealy on October 9. Amended Compl. ¶¶50-55. The second antibiotic was allegedly started on October 12, just one day before Mealy's last involvement with the Decedent. Id. ¶55. Viewed in this context, Mealy's failure to take more aggressive treatment measures on October 13, 2018 does not plausibly suggest that she was deliberately indifferent to the Decedent's medical needs.

Accordingly, the Court finds that, as pled, the Amended Complaint fails to state a viable §1983 claim against Mealy. The law of this Circuit nevertheless requires that Plaintiff be given an opportunity to amend her claim if doing so would not be inequitable or futile. *See Grayson v. Mayview State Hospital,* 293 F.3d 103, 108 (3rd Cir. 2002). At this point, the Court cannot say that further amendment would be either inequitable or futile. Therefore, Plaintiff will be given an opportunity to reassert her §1983 claim against Mealy, to the extent she can offer additional factual content that would state a plausible Eighth Amendment violation.

The Court reaches a different conclusion relative to the Eighth Amendment claim against Dr. Peterson. Unlike Mealy, Dr. Peterson continued to treat the Decedent during the last few days of her life, as her medical condition became increasingly dire and – presumably -- the need for aggressive, proactive treatment became increasingly obvious. Plaintiff's averments suggest that, by the time Dr. Peterson was contacted on October 17, 2018, the Decedent had clearly failed to respond to two different courses of antibiotics, and her vital signs had been abnormal for more than a week. She reportedly exhibited an elevated heart rate that day, as well as decreased blood pressure and a randomly elevated temperature. She was allegedly so weak on October 17 that she was unable to move and declined to see a dentist despite complaints of significant tooth pain. A prior x-ray had exposed pneumonia and a possible developing abscess in her lung. Plaintiff maintains that, in light of the Decedent's medical history and obviously deteriorating condition, Dr. Peterson showed deliberate indifference by declining to examine (or even speak with) the Decedent, failing to order further diagnostic testing to assess the infiltrates in the Decedent's lungs, failing to order intravenous antibiotics, and/or failing to hospitalize the Decedent. Instead, Dr. Peterson ordered that staff continue to monitor the Decedent's vital signs and temperature every shift until she was medically cleared. At this early stage of the

11

proceedings, Plaintiff has plausibly alleged that Dr. Peterson was deliberately indifferent to the Decedent's dire medical needs when, on October 17, 20108, he persisted in an ineffectual course of treatment in lieu of more aggressive medical measures.

Similarly, Plaintiff has pled a plausible Eighth Amendment violation based upon Dr. Peterson's conduct on October 19, 2018, which was the day before Decedent perished. According to the Amended Complaint, Decedent's oxygen level on October 18, 2018 was 87 percent and she was in obvious distress, visibly panting for breath. She had received an albuterol treatment and was coached on deep breathing techniques, but Plaintiff claims that neither of these measures was appropriate to address the Decedent's persistent pneumonia and developing sepsis. Amended Compl. ¶¶70-71. By the early morning hours of October 19, the Decedent was still febrile and exhibited wheezing in her left lung. She refused additional breathing treatments and informed the nurse they were not helping. Dr. Peterson allegedly reviewed the Decedent's chart in the mid-morning hours and was thus aware of her diminished oxygen levels and signs of distress but questioned her efforts with deep breathing. He ordered an x-ray but took no further action by way of follow-up. Critically, the x-ray showed prominent bilateral pneumonia and mild effusion on the right which, Plaintiff claims, indicated the need for immediate hospitalization. Instead, however, the Decedent was left alone in her cell for the remainder of the day without any further medical attention, allowing a critical opportunity for medical intervention to pass, as the infection inside the Decedent's body continued to spread. By the time Dr. Peterson was contacted at home the following morning, Plaintiff claims, it was too late to save the Decedent's life. Again, at this early stage of the litigation, Plaintiff's allegations are sufficient to state a plausible Eighth Amendment violation. Based on the averments in the Amended Complaint, a factfinder could infer that the Decedent's medical history, radiography,

signs and symptoms were all indicative of a critical medical state requiring immediate and aggressive measures that Dr. Peterson deliberately chose not to take.

In his motion to dismiss, Dr. Peterson contends that no Eighth Amendment violation can be proved because it is clear that he was paying attention to the Decedent and treating her. At most, he argues, Plaintiff's averments may support a claim for medical negligence, which is insufficient to establish a constitutional injury. But the existence *vel non* of deliberate indifference must be evaluated in the context of the medical need at issue, because what passes as adequate or merely negligent care in one situation may in another context be so patently deficient as to suggest indifference on the part of the caregiver. *See Palakovic v. Wetzel,* 854 F.3d 209, 228 (3d Cir. 2017) (recognizing "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements"). Here, Plaintiff has alleged that Dr. Peterson persisted in a course of treatment that he knew to be ineffective and/or that presented an obvious risk of serious harm to the Decedent. Under the law of this circuit, that is sufficient to demonstrate deliberate indifference. *See White v. Napolean,* 897 F.2d at 109 (finding a valid Eighth Amendment claim where the pleading alleged "persistent conduct in the face of resultant pain and risk of permanent injury"); *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) ("Prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition.") (internal quotation marks and citation omitted). In addition, Plaintiff has alleged that Dr. Peterson acted on the basis of non-medical reasons. *See* Amended Compl. ¶¶ 100, 101, 131-133. This too can serve as a basis for inferring deliberate indifference under Eighth Amendment jurisprudence. *See Monmouth Cty. Corr. Inst.,* 834 F.2d

13

at 347 (deliberate indifference is shown where necessary medical treatment is delayed for non-medical reasons) (internal quotation marks and citation omitted).

When deciding a Rule 12(b)(6) motion, "a court must consider no more than whether the complaint establishes 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements' of the cause of action." *Trzaska v. L'Oreal USA, Inc.*, 865 F. 3d 155, 162 (3d Cir. 2017) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016)). Here, the operative pleading does so. Although discovery may ultimately reveal facts that render Plaintiff's claim against Dr. Peterson deficient at the summary judgment stage, Plaintiff has presently alleged sufficient factual content to support her theory of deliberate indifference. Accordingly, the claim against Dr. Peterson in Count I will be permitted to proceed.

B. Plaintiff's Claims Under Pennsylvania Law

Counts II and III of the Amended Complaint set forth Pennsylvania wrongful death and survival claims against all Defendants. Having argued that Plaintiff failed to state a cognizable federal claim in Count I, Defendants contend that the Court should decline to exercise its supplemental jurisdiction over Counts II and III. *See* 28 U.S.C. §1367(c)(3) (allowing district courts to decline to exercise supplemental jurisdiction in cases where the underlying federal claim has been dismissed).

This argument is misplaced inasmuch as the Court is permitting the §1983 claim against Peterson to proceed forward and, as indicated above, Plaintiff will be permitted an opportunity to replead her claim against Mealy. Even if Plaintiff does not attempt to restate her §1983 claim against Mealy, however, the Court will continue to exercise supplemental jurisdiction over the state law claims against Mealy and Wexford, as those claims are "so related to" Plaintiff's

14

surviving Eighth Amendment claim "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a).

Jurisdictional concerns aside, Defendants Mealy and Wexford also argue that the Court should strike the allegations pertaining to Wexford, set forth in Paragraphs 9 through 24 of the Amended Complaint,[3] and dismiss Wexford from this case. According to the Defendants, Paragraphs 9 through 24 do not give rise to any cognizable cause of action, are irrelevant to the existing claims, and are included solely to cast aspersions on Wexford.

As an initial matter, the Court finds no basis to dismiss the wrongful death and survival claims against Wexford, which are predicated on a theory of vicarious liability. *See* Amended Compl. ¶¶ 25-26, 28, 109, 111, 137-149. At present, the professional liability claims against Mealy and Peterson remain pending, and Defendants do not challenge any substantive aspect of Plaintiff's vicarious liability theory.

The next question is whether the challenged averments should be stricken pursuant to Federal Rule of Civil Procedure 12, which allows the Court to strike from a pleading "any

---

[3] The challenged averments allege, in relevant part, that:

- Wexford is a for-profit corporation that contracted with Erie County to provide comprehensive healthcare services to inmates at the Erie County Prison at times relevant to this lawsuit;

- Erie County contracted with (and paid) Wexford to provide a medical director who would work fourteen hours per week at the Erie County Prison;

- Wexford subcontracted with Medical Associates of Erie under terms that provided for Dr. Peterson to work only eight hours per week at the Erie County Prison;

- as a result, Wexford denied county taxpayers the benefit of their bargain and deprived county inmates the benefit of having Dr. Peterson's services for six additional hours each week; and

- the reduced presence of a medical director has "resulted in an incalculable loss to inmates who have been deprived of their constitutionally mandated medical care."

Amended Compl. ¶¶9-24.

15

redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of striking allegations so is "'to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial maters.'" *Ream v. Nationwide Prop. & Cas. Ins. Co.*, NAIC, No. 2:19-CV-00768, 2019 WL 4254059, at *2 (W.D. Pa. Sept. 9, 2019) (quoting *Hildebrand v. Allegheny Cty.*, No. 12-cv-1122, 2012 WL 6093798, at *7 (W.D. Pa. Dec. 7, 2012)). Motions to strike are generally disfavored, and "'only allegations that are so unrelated to the plaintiffs' claims as to be unworthy of any consideration should be stricken.'" *Id.* (quoting *Miller v. Allstate Fire & Cas. Ins. Co.*, No. 07-cv-260, 2009 WL 577964, at *2 (W.D. Pa. Mar. 5, 2009)).

In this case, the allegations concerning Wexford's contractual relations with Erie County and with Medical Associates of Erie may arguably have some bearing on agency principles that are pertinent to Plaintiff's vicarious liability claims. And, if discovery should reveal that Wexford's contractual policies were a moving force behind the Decedent's constitutional injury, Plaintiff may have grounds to amend her pleading so as to assert an Eighth Amendment claim against Wexford. *See Palakovic,* 854 F.3d at 232 ("To state a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must allege a policy or custom that resulted in the alleged constitutional violations at issue.") (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). Accordingly, Plaintiff's request to strike Paragraphs 9 through 24 of the Amended Complaint will be denied.

### IV. CONCLUSION

Based upon the foregoing reasons, the motion to dismiss filed by Dr. Peterson will be denied. The motion to dismiss filed by Defendants Mealy and Wexford will be granted only insofar as it relates to the Eighth Amendment claim against Mealy; in all other respects the motion will be denied.

An appropriate order follows.

SUSAN PARADISE BAXTER
United States District Judge